T.C. Memo. 2012-155

UNITED STATES TAX COURT

GARY GARCIA AND BROOKE GARCIA, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

CALIFORNIA RADOMES, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6178-10, 6182-10.            Filed May 31, 2012.

Anthony V. Diosdi, for petitioners.

John W. Strate and Nathan H. Hall, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:  With respect to Gary and Brooke Garcia respondent

determined deficiencies in Federal income tax of $57,125, $73,591, and $68,411 for

tax years 2005, 2006, and 2007, respectively.  Respondent also determined

penalties under section 6663(a)[1] of $42,843, $55,193, and $51,330 for 2005, 2006, and 2007, respectively.

With respect to California Radomes, Inc. (California Radomes), respondent determined deficiencies in Federal income tax of $48,535, $99,547, and $41,887 for tax years 2005, 2006, and 2007, respectively. Respondent also determined penalties under section 6663(a) of $36,401, $74,660, and $31,415 for 2005, 2006, and 2007, respectively, as well as an addition to tax under section 6651(a)(1) of $10,471 for 2007.

These cases were consolidated for trial, briefing, and opinion. As a result of concessions by the parties, all issues pertaining to underpayments of tax and the section 6651(a)(1) addition to tax have been settled. The remaining issues relate to the imposition of certain penalties on those underpayments of tax. The issues remaining for decision are:

(1) whether Mr. Garcia is liable for the section 6663(a) fraud penalty for tax years 2005, 2006, and 2007. We hold that he is;

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

(2)  in the alternative to the fraud penalty, whether Mr. Garcia is liable for the accuracy-related penalty under section 6662(a) for tax years 2005, 2006, and 2007. We need not decide this issue;

(3)  whether California Radomes is liable for the section 6663(a) fraud penalty for tax years 2005, 2006, and 2007.  We hold that it is;

(4)  in the alternative to the fraud penalty, whether California Radomes is liable for the accuracy-related penalty under section 6662(a) for tax years 2005, 2006, and 2007.  We need not decide this issue; and

(5)  whether Mrs. Garcia is liable for the accuracy-related penalty under section 6662(a) for tax years 2005, 2006, and 2007.  We hold she is not.

## FINDINGS OF FACT

At the time their petition was filed, Mr. and Mrs. Garcia resided in California. California Radomes is a California corporation which had its principal place of business in California at the time its petition was filed.

## I.  Background

Since its establishment by Mr. Garcia in 1980, California Radomes has engaged in the business of overhauling and repairing radomes,[2] principally those of aircraft.  Mr. Garcia owned 100% of the common stock of California Radomes

---

[2]A radome encapsulates and protects the radar unit of an aircraft or boat.

during 2005, 2006, and 2007. He was also California Radomes' president, chairman of the board of directors, and chief financial officer from at least 1983 through 2007.

Mr. Garcia has a high school diploma and attended vocational school to become an aircraft mechanic. He has also taken some college level music classes but did not earn a college degree. Mr. Garcia has never taken any classes in tax or accounting, although he does have at least a passing familiarity with tax and accounting concepts picked up while operating California Radomes.[3] Before starting California Radomes, Mr. Garcia worked for United Airlines from 1966 to 1980.

During 2005, 2006, and 2007 California Radomes' board of directors consisted of Mr. Garcia, Tony Garcia (Mr. Garcia's son), Michelle Simon, and Martha Jaszkowski. Mr. Garcia characterized himself as the "technical guy" in the company who oversaw work done by the technicians. Ms. Simon was the general manager of California Radomes and was in charge of day-to-day operations. Ms. Jaszkowski's duties included overseeing accounts receivable and accounts

---

[3]For example, Mr. Garcia discussed several tax concepts relating to subch. S corporations at a 1983 organizational meeting for California Radomes. In addition, Mr. Garcia showed some grasp of common accounting terminology during his testimony at trial.

payable, as well as inputting data into accounting software for the preparation of California Radomes' financial statements.

California Radomes had three bank accounts: (1) a general bank account; (2) a payroll bank account; and (3) a "holding" bank account. California Radomes reconciled its general bank account to its financial statements, but did not do so for the payroll bank account. The holding account was described at trial as "basically a savings account"[4] and is discussed further infra.

## II. Mr. Garcia's Use of Corporate Funds for Personal Expenditures

At some point Mr. Garcia began: (1) withdrawing funds from California Radomes' holding account and depositing them into his personal accounts; and (2) otherwise using corporate funds held in the holding account to pay personal expenses. Mr. Garcia repaid a portion of the funds to California Radomes during 2005, 2006, and 2007. Petitioners concede Mr. Garcia should have reported withdrawals and personal use of corporate funds (net of repayments) as constructive dividend income.

---

[4]Ms. Simon described the times when money would be deposited in the holding account as times when California Radomes "had extra income or, you know, like if we had an extra check come in, we would put it into that account, or it would be transfer money from the business account."

Petitioners concede that Mr. and Mrs. Garcia received a constructive dividend of $156,017 for 2005. This constructive dividend consisted of: (1) $10,840 for payment of a personal insurance expense by California Radomes; (2) $101,384 for payment of Mr. and Mrs. Garcia's home mortgage by California Radomes; (3) a $91,325 withdrawal by Mr. Garcia; and (4) $51,468[5] for California Radomes income which was deposited into Mr. Garcia's personal account. The total of these amounts was reduced by $99,000 in repayments Mr. Garcia made to California Radomes.

Petitioners concede that Mr. and Mrs. Garcia received a constructive dividend of $268,098 for 2006. This constructive dividend consisted of: (1) $11,256 for payment of insurance on Mr. Garcia's personal vehicles by California Radomes; (2) $110,142 for payment of Mr. and Mrs. Garcia's home mortgage by California Radomes; and (3) a $167,200 withdrawal by Mr. Garcia. The total of

---

[5]This $51,468 was used to purchase The Other Office, a boat purportedly used by California Radomes for business purposes. Although respondent conceded payments made by California Radomes for "boat payments" and "boat maintenance" in 2007, it is unclear whether those payments were made on/for The Other Office or a second boat owned by California Radomes. Mr. Garcia testified that he deposited the $51,468 into his personal account so he could use his personal credit to obtain a boat loan, as California Radomes' credit was insufficient to qualify.

these amounts was reduced by $20,500 in repayments Mr. Garcia made to California Radomes.

Petitioners concede that Mr. and Mrs. Garcia received a constructive dividend of $147,711 for 2007. This constructive dividend consisted of: (1) $11,445 for payment of a personal insurance expense by California Radomes; (2) $111,766 for payment of Mr. and Mrs. Garcia's home mortgage by California Radomes; (3) a $60,000 withdrawal by Mr. Garcia; and (4) $4,500 for payment of Mr. and Mrs. Garcia's personal taxes by California Radomes. The total of these amounts was reduced by $40,000 in repayments Mr. Garcia made to California Radomes.

California Radomes maintained a loan to shareholder account on its balance sheet. This account was established by one of California Radomes' accountants (discussed further infra), purportedly to help track loans made by California Radomes to Mr. Garcia and repayment of those loans. California Radomes reported the beginning and ending balances of the loan to shareholder account on Schedule L, Balance Sheets Per Books, on its 2005, 2006, and 2007 tax returns. In 2005 the beginning balance was $398,136 and the ending balance was $365,145, a decrease of $32,991. In 2006 the beginning balance was $365,145 and the ending balance was $521,929, an increase of $156,784. In 2007 the

beginning balance was $521,929 and the ending balance was $779,320, an increase of $257,391.

In addition to the loan to shareholder account on California Radomes' balance sheet, California Radomes' general ledger from 2005, 2006, and 2007 included an entry entitled "Loan to Officer" which had various memos for transfers affecting the entry.[6] These general ledger entries reflected the same balances and total changes as the loan to shareholder account for 2005 and 2006, but showed only a $1,500 increase in 2007 (as opposed to a $257,391 increase in the loan to shareholder account in 2007).

Mr. Garcia did not sign a promissory note with respect to the funds of California Radomes which he withdrew or used to pay personal expenses. There was no repayment plan for the funds and the funds did not accrue interest. Ms. Simon was not aware that Mr. Garcia deposited corporate funds into his personal accounts; it was not established whether other members of California Radomes' board of directors knew.

---

[6]For example, many of the decreases in the Loan to Officer entries on the general ledger were labeled as loans from Mr. Garcia, deposits, or "payroll", while many of the additions were labeled as reimbursements, withdrawals, or fund transfers.

III. Petitioners' Tax Returns and Preparation

Mr. Garcia has used the services of a tax professional to prepare California Radomes' tax returns since its establishment. In 2004 Mr. Garcia hired Gordon Ostrem for tax preparation services after California Radomes' prior tax return preparer passed away. This prior accountant had established the loan to shareholder account for California Radomes. Mr. Ostrem was a certified public accountant (C.P.A.) with 20 years' experience and a tax partner with Pfahnl & Hunt, at the time Mr. Garcia retained him.[7] Mr. Ostrem was labeled a "C.P.A. consultant" because California Radomes did not have an in-house C.P.A.

Mr. Ostrem used information provided to him by Ms. Simon and Ms. Jaszkowski to prepare California Radomes' 2005 and 2006 Federal corporate tax returns, as well as California Radomes' 2007 State sales tax return. The information provided to Mr. Ostrem included credit card statements, receipts, and California Radomes' general ledger. Either through these documents or otherwise, Mr. Ostrem became aware of the loan to shareholder account and the loan to officer entry on the general ledger.

---

[7]Mr. Ostrem continued working at Pfahnl & Hunt after he was retained by California Radomes.

Mr. Ostrem was also provided with bank account statements for California Radomes' general and payroll accounts, but was not provided with any information about the holding account or told of its existence, even when he requested information about such a potential bank account associated with the loan to shareholder account.[8] Mr. Ostrem did not discover the existence of the holding account until his participation in an audit of California Radomes by the Internal Revenue Service (discussed further infra).

In preparing returns for California Radomes, Mr. Ostrem reconciled the corporate financial statements to the payroll account (an act which had already been completed for the general bank account). Mr. Ostrem signed California Radomes' 2005 return on September 12, 2006, and provided the return to California Radomes on or after that date. The 2005 return was due by September 15, 2006, but was filed September 18, 2006. Mr. Ostrem signed California Radomes' 2006 return on September 14, 2007, and provided the return to

---

[8]Contrary to Mr. Ostrem's testimony, Ms. Simon testified that although she did not originally provide Mr. Ostrem with bank statements for the holding account, she did so when he inquired about such a potential bank account. Considering certain evidence from 2006, 2008, and 2009 (which supports Mr. Ostrem's testimony that he was unaware of the existence of the holding account until at least 2008), as well as California Radomes' failure to provide an Internal Revenue Service auditor with information about the holding account (discussed further infra), we find Mr. Ostrem's testimony more credible.

California Radomes on September 15, 2007, the date by which the return was due. The 2006 return was filed on September 17, 2007.

Mr. Ostrem provided the 2007 State sales tax return to California Radomes and it was signed by Mr. Garcia on January 30, 2008, the day before the return was due. California Radomes filed its 2007 corporate income tax return on March 27, 2009. This return was prepared by Jonathan Seiki, an employee of the Law Offices of Stephen Moskowitz, LLP.

On its 2005, 2006, and 2007 income tax returns, California Radomes reported gross receipts of $2,461,283, $2,486,198, and $2,485,813, respectively, and claimed certain deductions to determine its taxable income.[9] In his notice of deficiency respondent determined an increase in California Radomes' gross receipts and disallowed certain deductions claimed on the returns.[10] The parties later agreed that California Radomes underreported its gross income for 2005, 2006, and 2007 by $156,251, $178,081, and $30,387, respectively.

---

[9]The 2005, 2006, and 2007 corporate tax returns listed taxable income of negative $33,639, positive $96,566, and positive $192,473, respectively.

[10]Those adjustments were made because California Radomes was deducting personal expenses of Mr. and Mrs. Garcia (such as certain insurance and automobile expenses) as its own business expenses and not including certain sums in its gross receipts as a result of the payments made to or on behalf of Mr. Garcia.

In addition to the tax returns he completed for California Radomes, Mr. Ostrem also prepared Mr. and Mrs. Garcia's 2005, 2006, and 2007 joint personal income tax returns, which were timely filed. Much as with the corporate tax returns he completed for California Radomes, Mr. Ostrem was aware of the loan to shareholder account and the loan to officer entry in California Radomes' general ledger at the time he prepared Mr. and Mrs. Garcia's personal tax returns. However, Mr. Ostrem was not aware of the holding account when he prepared any of these returns. In addition, it appears Mr. Garcia did not discuss with Mr. Ostrem the fact that he was withdrawing corporate funds and depositing them in his personal bank account.[11]

_____

[11]At trial Mr. Garcia gave a somewhat evasive answer when asked by respondent's counsel on direct examination about his discussions with Mr. Ostrem regarding such use of corporate funds--

Q: In 2005, did you tell Mr. Ostrem about these transfers [of corporate funds into your personal account]?

A: I don't speak with Gordon -- I didn't speak with Gordon. My only contact with Gordon is when I hired him. I'm a firm believer in consultants and so I was looking for a consultant for accounting --

Q: Okay.

A: -- for a CPA.

Q: Okay.

(continued...)

Mr. Ostrem had the Garcias fill out an information packet to enable him to prepare their personal returns. Mr. Garcia did not list any dividends received in the completed packet he returned to Mr. Ostrem, nor did Mr. Garcia otherwise account for his purported borrowing of corporate funds.[12] Mr. and Mrs. Garcia reported total income comprising only wages and taxable interest,[13] totaling $221,101, $189,373, and $232,915 for 2005, 2006, and 2007, respectively.

---

[11](...continued)
A: -- and I was given his name -- or Mr. Hunt was the name I was given. And I called that firm and they said that Mr. Hunt wasn't taking any further clients, but they had someone, who they could recommend, within their client [sic]. And I had made an appointment to see him, which happened to be Gordon. And I went and talked to him and asked him some questions. And he assured me that he was a professional and could do whatever we needed to do as far as CPA work or accounting and tax preparation, and I hired him. And then after that, I kind of backed off of it and the office took care of it. So, I really didn't have any other contact. I mean, I've talked to him maybe once or twice on the phone, but that's the limit of my contact with him.

[12]The information packet asked for information about dividends received but did not specifically ask for information relating to corporate funds borrowed by Mr. Garcia.

[13]The taxable interest Mr. and Mrs. Garcia received in each of the three years at issue was less than $2,000.

## IV. Audit

Respondent audited petitioners' 2005, 2006, and 2007 corporate and individual tax returns. The initial audit letter was mailed in March 2008 and the audit concluded in October 2009. Allison Redington was the auditor assigned to the audit of petitioners' tax returns. During the audit Ms. Redington met with Mr. Garcia and was given a tour of California Radomes. Throughout the audit petitioners and Ms. Redington maintained open lines of communication. In addition, Mr. Garcia executed a Form 872, Consent to Extend the Time to Assess Tax, at the request of Ms. Redington.

Ms. Redington reviewed petitioners' individual and corporate tax returns and attempted to reconstruct their income by means of a bank deposits analysis. To complete her bank deposits analysis for California Radomes, Ms. Redington requested all of the corporation's bank account statements, a copy of the general ledger, cash disbursement and cash receipts journals, all corporate books, automobile logs, and additional corporate information. She received all this information on the first day of the audit, except for the holding account statements and logs for The Other Office, which were not initially provided to her.

Ms. Redington also requested certain information from Mr. and Mrs. Garcia, most of which she received upon request. However, Mr. and Mrs. Garcia

did not supply Ms. Redington with their personal bank account statements when she requested them.  Ms. Redington eventually received these bank account statements by issuing a summons to Mr. and Mrs. Garcia's bank.

Using the information initially provided to her by California Radomes, Ms. Redington was unable to reconcile income per books with the income determined by the bank deposits analysis.  When asked about the loan to shareholder account Mr. Garcia told Ms. Redington that California Radomes had set the account up at the direction of Mr. Ostrem.[14]  Subsequent investigation by Ms. Redington led to her discovery of the holding account and the corporate payments on behalf of and withdrawals by Mr. Garcia.  When asked why California Radomes was making payments on his house Mr. Garcia told Ms. Redington that California Radomes was investing in real estate.

Mr. Ostrem represented petitioners at the beginning of the audit.  During the audit he finally learned that California Radomes also had a bank account "that was not on California Radomes' books" (the holding account).  Mr. Ostrem requested and received the holding account statements in an attempt to reconcile this account

---

[14]Petitioners admit Mr. Garcia was mistaken on this point but claim the mistake was an honest one.  They point out that another witness, when asked at trial, also had trouble remembering which accountant had helped set up the account.

with California Radomes' financial statements. When Mr. Ostrem could not do so, he sought further explanation of the account from Mr. Garcia. Mr. Ostrem received evasive answers to his queries and was subsequently fired.[15]

## V. Other Information

On December 11, 2009, respondent issued a notice of deficiency to California Radomes for tax years 2005, 2006, and 2007 and a notice of deficiency to Mr. and Mrs. Garcia for tax years 2005, 2006, and 2007. Petitioners timely filed petitions contesting the deficiencies,[16] additions to tax, and penalties.

## OPINION

## I. Whether Mr. Garcia Is Liable for Fraud Penalties Under Section 6663(a) for 2005, 2006, and 2007

The Commissioner has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To satisfy the burden of proof, the Commissioner must show: (1) an underpayment of tax exists; and (2) the taxpayer

---

[15]Petitioners claim that there is no proof Mr. Ostrem was fired as a result of his seeking information on the holding account. Petitioners state that "There are a myriad of possible reasons why petitioner may have fired Ostrem" and that "Certainly, respondent's theory may be one." Petitioners speculate that Mr. Ostrem may have been fired because he provided California Radomes' tax returns just before the dates they were due (in spite of receiving information to complete the returns six months before) or because petitioners had never had tax-related trouble until Mr. Ostrem began preparing their returns.

[16]The deficiency issues were later settled, as described supra p. 2.

intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Sadler v. Commissioner, 113 T.C. 99, 102 (1999); Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).

A.  Underpayment of Tax

The clear and convincing standard applies not merely to whether an underpayment is attributable to fraud, but also to whether an underpayment exists. Parks v. Commissioner, 94 T.C. at 660-661; Di Ricco v. Commissioner, T.C. Memo. 2009-300.  Where fraud is determined for each of several years, the Commissioner's burden applies separately for each of the years. Roth v. Commissioner, T.C. Memo 1998-28.  Petitioners have conceded that Mr. and Mrs. Garcia failed to report constructive dividends received of $156,017, $268,098, and $147,711 for 2005, 2006, and 2007, respectively.  Therefore, there is clear and convincing evidence that Mr. Garcia underreported his income for 2005, 2006, and 2007 and underpaid his income tax for these years.

B.  Fraudulent Intent

The Commissioner must prove by clear and convincing evidence that a portion of the underpayment for each taxable year in issue was due to fraud. Prof'l Servs. v. Commissioner, 79 T.C. 888, 930 (1982).  Once the Commissioner establishes that any portion of an underpayment is attributable to fraud, the entire

underpayment is subject to the 75% penalty, except with respect to any portion of the underpayment that the taxpayer establishes is not attributable to fraud. Sec. 6663(a) and (b). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 516 (1992).

The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). Because direct proof of a taxpayer's intent is rarely available, fraud may be proved by circumstantial evidence and reasonably inferred from the facts. Spies v. United States, 317 U.S. 492, 499 (1943); Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Certain indicia, commonly known as badges of fraud, constitute circumstantial evidence which may give rise to a finding of fraudulent intent. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), aff'g T.C. Memo. 1984-601. "Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia is persuasive circumstantial evidence of fraud." Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989).

### 1.  Consistent and Substantial Underreporting of Income

A consistent pattern of underreporting large amounts of income is evidence of fraud.  See Holland v. United States, 348 U.S. 121 (1954); Delvecchio v. Commissioner, T.C. Memo. 2001-130 ("Two years of substantial understatement [of income] may support a finding of fraud."), aff'd, 37 Fed. Appx. 979 (11th Cir. 2002).  Petitioners have conceded that Mr. and Mrs. Garcia failed to report constructive dividends received of $156,017, $268,098, and $147,711 for 2005, 2006, and 2007, respectively.  These are large amounts compared to Mr. and Mrs. Garcia's total income of $221,101, $189,373, and $232,915 originally reported for 2005, 2006, and 2007, respectively.

### 2.  Information Concealed From Mr. Ostrem

Petitioners argue that Mr. Garcia did not act fraudulently because he relied in good faith on an accountant, Mr. Ostrem, to prepare his personal tax returns. Petitioners correctly point out that a taxpayer's justifiable reliance on an accountant to prepare income tax returns may indicate an absence of fraudulent intent.  Marinzulich v. Commissioner, 31 T.C. 487, 492 (1958); Whyte v. Commissioner, T.C. Memo. 1986-486, aff'd, 852 F.2d 306 (7th Cir. 1988).  In support of their position, petitioners argue that Mr. Garcia is unsophisticated in the area of tax and was unaware that his use of corporate funds could constitute

taxable income to him. See Vorsheck v. Commissioner, 933 F.2d 757, 759 (9th Cir. 1991) (taxpayers who relied upon their accountant and knew nothing about tax law not liable for penalties).

Respondent argues that Mr. Garcia cannot rely on the fact that Mr. Ostrem prepared the returns because Mr. Garcia (as well as California Radomes, with the knowledge of Mr. Garcia) concealed information necessary for Mr. Ostrem to properly prepare Mr. Garcia's personal tax returns. Estate of Temple v. Commissioner, 67 T.C. 143, 162 (1976) ("While a taxpayer's reliance upon his accountant to prepare accurate returns may indicate an absence of fraudulent intent, John Marinzulich, 31 T.C. 487, 490 (1958), this is true in the first instance only if the accountant has been supplied with all the information necessary to prepare the returns."). In addition, respondent claims Mr. Garcia's failure to provide Mr. Ostrem with complete and accurate records is evidence of Mr. Garcia's intent to conceal and deceive. Dubose v. Commissioner, T.C. Memo. 1996-99; Scallen v. Commissioner, T.C. Memo. 1987-412 ("The failure by a taxpayer to make available complete and accurate records to the person charged with the responsibility of preparing the taxpayer's returns may, in the view of the courts, reflect an intent on the taxpayer's part to conceal and deceive."), aff'd, 877 F.2d 1364 (8th Cir. 1989). We agree with respondent.

The loan to officer entry on California Radomes' 2005 general ledger provided to Mr. Ostrem reflected a $32,991 decrease in the loan to shareholder account on California Radomes' balance sheet. However, the loan to shareholder account should have been increased by $156,017.[17] Similarly, the loan to shareholder account and general ledger each understated the amount "loaned" to Mr. Garcia by more than $100,000 in 2006. The general ledger also understated the amount "loaned" to Mr. Garcia by more than $100,000 in 2007.[18]

In addition to understating the amount of corporate funds used by Mr. Garcia personally in the information provided to Mr. Ostrem, California Radomes also concealed information from Mr. Ostrem that would have allowed him to identify the understatements and properly prepare Mr. and Mrs. Garcia's personal

---

[17]This amount is the total of $10,840 for payment of an insurance expense by California Radomes, $101,384 for payment of Mr. and Mrs. Garcia's home mortgage by California Radomes, $91,325 withdrawn by Mr. Garcia, and $51,468 for California Radomes' income which was deposited into Mr. Garcia's personal account offset by $99,000 in repayments made by Mr. Garcia.

[18]The parties did not explain the disparity in the loan to officer entry on the 2007 general ledger and the 2007 loan to shareholder account. The Loan to Officer entry showed an increase of only $1,500 while the loan to shareholder account showed an increase of over $257,391. We suspect that petitioners may have increased the balance of the loan to shareholder account when respondent's audit commenced (or as the audit progressed) to more accurately reflect the actual amount of California Radomes' funds used by Mr. Garcia personally during the years at issue.

tax returns. When supplying Mr. Ostrem with information to prepare California Radomes' corporate tax returns, Ms. Simon did not provide Mr. Ostrem with the holding account information or tell him that such an account existed. Mr. Ostrem suspected that such an account existed and was related to the loan to shareholder balance sheet account. Mr. Ostrem requested information about any such account but was again not supplied with such information or told of the account's existence. Had he been made aware of the holding account, Mr. Ostrem could have attempted to reconcile this account to California Radomes' general ledger (as he did with the unreconciled payroll account), which presumably would have led him to discover the information necessary to properly prepare Mr. and Mrs. Garcia's personal tax returns.

Furthermore, Mr. Garcia did not account for his use of corporate funds when filling out an information packet for Mr. Ostrem or otherwise alert Mr. Ostrem to the fact that the loan balances as stated in the general ledger were understated. Petitioners claim that this was an innocent mistake arising from Mr. Garcia's lack of tax knowledge.[19] However, given the various actions which Mr.

---

[19]For example, petitioners claim on brief that Mr. Garcia honestly believed that California Radomes paid his personal mortgage because the company was investing in real estate. Petitioners made no attempt to support this claim by providing evidence which might tend to show that a reasonable person might

(continued...)

Garcia and California Radomes took (or failed to take) to conceal the true extent of Mr. Garcia's use of corporate funds, we believe that Mr. Garcia's actions were not an innocent mistake. Rather, we believe that petitioners' actions were part of a pattern taken to purposefully conceal income from Mr. Ostrem (and later from Ms. Redington).

As a result of Mr. Garcia's failure to supply Mr. Ostrem with information necessary to accurately prepare his personal tax returns (or notify Mr. Ostrem that the information supplied by California Radomes was incorrect), Mr. Garcia's purported reliance on Mr. Ostrem does not prove his lack of fraudulent intent. See Estate of Temple v. Commissioner, 67 T.C. at 162. Indeed, Mr. Garcia's efforts to conceal information from Mr. Ostrem is evidence of Mr. Garcia's intent to conceal and deceive. See Scallen v. Commissioner, T.C. Memo. 1987-412.

### 3. Information Concealed From Ms. Redington

Making false statements to or failure to cooperate with the Commissioner's agents during the course of their examinations is a badge of fraud. Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980); Tilley v. Commissioner, T.C. Memo.

---

[19](...continued) believe California Radomes was in fact investing in real estate. We also note that the Schedules L, Balance Sheets Per Books, attached to California Radomes' 2005, 2006, and 2007 corporate tax returns each reflect no real estate (net of amortization) held by California Radomes.

2009-83.  Petitioners argue that Mr. Garcia fully cooperated with Ms. Redington because Mr. Garcia provided most personal and corporate documents the day after Ms. Redington requested them, gave Ms. Redington a tour of California Radomes, signed a Form 872 at Ms. Redington's request, and maintained open lines of communication with Ms. Redington.  While we acknowledge Mr. Garcia's cooperation with Ms. Redington on some issues, we believe that Mr. Garcia failed to cooperate with Ms. Redington with regard to the most important issue:  Mr. Garcia's personal use of California Radomes' funds.

Although Ms. Redington requested all of California Radomes' bank account statements, she was not supplied with any information about the holding account, which was necessary to reconcile income per books with the income determined by her bank deposits analysis.  When the existence of the holding account was finally uncovered and Ms. Redington was seeking additional information on California Radomes' purported loans to Mr. Garcia, Mr. Garcia told her that California Radomes was paying his personal mortgage because the corporation was investing in real estate.  As described supra note 19, petitioners claim on brief that Mr. Garcia honestly believed California Radomes was paying his personal mortgage as part of an investment in real estate but have provided no evidence which would support such a belief.  We believe Mr. Garcia's statement was simply

intended to deceive Ms. Redington and delay the investigation of his personal taxes and California Radomes' corporate taxes.

In addition to making the false statement about real estate investment to Ms. Redington, Mr. Garcia failed to provide her with his and Mrs. Garcia's personal bank account statements when that information was requested. Ms. Redington eventually received these bank account statements by issuing a summons to Mr. and Mrs. Garcia's bank.

We believe that Mr. Garcia's actions when dealing with Ms. Redington were intended to conceal information which eventually led her to discover understatements of income for both Mr. Garcia and California Radomes. We find the concealment of such information from Ms. Redington and the false statements made in connection with that concealment to be badges of fraud.

4. Mr. Garcia's Fraudulent Intent and Liability for the Section 6663(a) Fraud Penalty

Considering the facts discussed above, we find that respondent has proven by clear and convincing evidence that Mr. Garcia acted with fraudulent intent in understating his income for 2005, 2006, and 2007. As we have also found that respondent proved by clear and convincing evidence that underpayments of tax

were made for the same years, Mr. Garcia is liable for the section 6663(a) fraud penalty for each year at issue.

II.  Whether California Radomes Is Liable for Fraud Penalties Under Section 6663(a) for 2005, 2006, and 2007

"Where fraud is alleged against a corporate taxpayer, the requisite proof of fraudulent intent is to be found in the acts of its officers, inasmuch as the corporation, being an artificial person created by law, can have no separate intent of its own apart from those who direct its affairs."  Ruidoso Racing Ass'n, Inc. v. Commissioner, T.C. Memo. 1971-194, aff'd in part, rev'd in part, 476 F.2d 502 (10th Cir. 1973).  A corporation does not escape responsibility for the acts of its duly authorized officers who have performed wrongfully in that capacity.  Id.  Given Mr. Garcia's position as California Radomes' president, chairman of the board of directors, chief financial officer, and sole shareholder, as well as the relationship between the tax deficiencies of Mr. Garcia and California Radomes, most of the same facts described supra pp. 18-25 relating to the fraudulent intent of Mr. Garcia are also applicable with respect to the fraudulent intent of California Radomes.  For this reason we will try to be concise when repeating facts previously discussed.

A.  Underpayment of Tax

Petitioners have conceded that California Radomes underreported its income for 2005, 2006, and 2007 by $156,251, $178,081, and $30,387, respectively. Therefore, there is clear and convincing evidence that California Radomes underreported its income for 2005, 2006, and 2007 and underpaid its income tax for these years.

B.  Fraudulent Intent

1.  Consistent and Substantial Underreporting of Income

A consistent pattern of underreporting large amounts of income is evidence of fraud.  See Holland v. United States, 348 U.S. 121; Delvecchio v. Commissioner, T.C. Memo. 2001-130 ("Two years of substantial understatement [of income] may support a finding of fraud.").  Petitioners have conceded that California Radomes underreported its income for 2005, 2006, and 2007 by $156,251, $178,081, and $30,387, respectively.  These are large amounts compared to California Radomes' reported taxable income of negative $33,639, positive $96,566, and positive $192,473 originally reported for 2005, 2006, and 2007, respectively.

## 2. Information Concealed From Mr. Ostrem

As discussed supra pp. 19-23, there were significant discrepancies between the amounts listed as loans to Mr. Garcia on the general ledger supplied to Mr. Ostrem for preparation of California Radomes' corporate tax returns and the actual amounts of corporate funds which Mr. Garcia used personally. The officers of California Radomes failed to provide Mr. Ostrem with information about the corporate holding account or tell him that the holding account existed, even when he requested any information about such an account. Had he been provided with information about this holding account, Mr. Ostrem would have been able to deduce that the information contained on the general ledger relating to loans to Mr. Garcia was incorrect and properly prepare California Radomes' corporate tax returns.

Furthermore, Mr. Garcia did not account for his use of corporate funds when filling out an information packet for Mr. Ostrem or otherwise alert Mr. Ostrem to the fact that the loan amounts in the general ledger were understated. As discussed supra pp. 22-23, we believe this was not an innocent mistake but a deliberate attempt to conceal from Mr. Ostrem information needed to properly prepare California Radomes' corporate tax returns.

As a result of California Radomes' failure to supply Mr. Ostrem with information necessary to prepare its tax returns, California Radomes' purported reliance on Mr. Ostrem does not prove its lack of fraudulent intent. See Estate of Temple v. Commissioner, 67 T.C. at 162. Indeed, California Radomes' efforts to conceal information from Mr. Ostrem is evidence of its intent to conceal and deceive. See Scallen v. Commissioner, T.C. Memo. 1982-412.

### 3. Information Concealed From Ms. Redington

Although Ms. Redington requested all of California Radomes' bank account statements, she was not supplied with any information about the holding account, which was necessary to reconcile income per books with the income determined by her bank deposits analysis. When the existence of the holding account was finally uncovered and Ms. Redington was seeking additional information on California Radomes' purported loans to Mr. Garcia, Mr. Garcia told her that California Radomes was paying his personal mortgage because the corporation was investing in real estate. As described supra note 19, petitioners claim on brief that Mr. Garcia honestly believed California Radomes was paying his personal mortgage as part of an investment in real estate but have provided no evidence which would support such a belief. We believe Mr. Garcia's statement was simply intended to deceive

Ms. Redington and delay her investigation of his personal taxes and California Radomes' corporate taxes.

In addition to making the false statement about real estate investment to Ms. Redington, Mr. Garcia also failed to provide her with his and Mrs. Garcia's personal bank account statements when that information was requested. Ms. Redington eventually received these bank account statements by issuing a summons to Mr. and Mrs. Garcia's bank. Those bank statements would have aided Ms. Redington in her reconstruction of the financial dealings between Mr. Garcia and California Radomes and therefore help her to properly determine California Radomes' income.

We believe that California Radomes' actions in dealing with Ms. Redington were intended to conceal information which eventually led her to discover understatements of income for both Mr. Garcia and California Radomes. We find the concealment of that information from Ms. Redington and the false statement made in connection with that concealment to be badges of fraud.

4. <u>California Radomes' Fraudulent Intent and Liability for the Section 6663(a) Fraud Penalty</u>

Considering the facts discussed above, we find that respondent has proven by clear and convincing evidence that California Radomes acted with fraudulent intent

in understating its income for 2005, 2006, and 2007.[20]  As we have also found that respondent proved by clear and convincing evidence that underpayments of tax were made in the same years, California Radomes is liable for the section 6663(a) fraud penalty for each year at issue.

III.  Whether Mrs. Garcia Is Liable for the Accuracy-Related Penalty Under Section 6662(a) for Tax Years 2005, 2006, and 2007

Where a joint return is filed and one spouse is liable for fraud with respect to the entire underpayment, the imposition of the section 6662(a) accuracy-related penalty with respect to the other spouse would result in impermissible stacking. Sec. 6662(b); Zaban v. Commissioner, T.C. Memo. 1997-479; Aflalo v. Commissioner, T.C. Memo. 1994-596; Minter v. Commissioner, T.C. Memo. 1991-448.  Thus, we hold that Mrs. Garcia is not liable for the accuracy-related penalty for the years at issue.

---

[20]Petitioners made no argument that California Radomes' tax year 2007 should have been treated any differently from tax years 2005 and 2006 as a result of Mr. Seiki's preparing the 2007 corporate tax return instead of Mr. Ostrem.  We deem this issue waived by petitioners.  See Muhich v. Commissioner, 238 F.3d 860, 864 n.10 (7th Cir. 2001) (issues not addressed or developed are deemed waived--it is not the Court's obligation to research and construct the parties' arguments), aff'g T.C. Memo. 1999-192.

IV. <u>Conclusion</u>

We find that Mr. Garcia and California Radomes are both liable for fraud penalties under section 6663 for 2005, 2006, and 2007. We further find that Mrs. Garcia is not liable for the accuracy-related penalty for 2005, 2006, or 2007.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.